IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.: 21-cr-378-TJK-5 |
| | : | |
| v. | : | 18 U.S.C. § 1752(a)(1) |
| | : | |
| KEVIN A. TUCK, | : | |
| | : | |
| Defendant. | : | |

**STATEMENT OF OFFENSE**

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Kevin A. Tuck, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752, due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives

and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. This joint session of Congress was an official proceeding as that term is used in Title 18, United States Code, Section 1512. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 p.m., the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 p.m., members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

8. The attack at the U.S. Capitol adversely affected the United States Secret Service, which was protecting Vice President Michael Pence. It also affected commerce within the District of Columbia. For example, it affected the sales of Safeway grocery stores within the District of Columbia, whose products also travel in interstate commerce before being sold in the District. D.C. Mayor Muriel Bowser imposed a 6 p.m. curfew on January 6 in response to the riot, and Safeway stores in the District of

Columbia closed at 4 p.m. (instead of 11 p.m.) as a result, resulting in lost sales.

9. The attack at the U.S. Capitol was a "civil disorder" as defined in 18 U.S.C. § 232(1).

### *Kevin Tuck and the Proud Boys*

10. Kevin Tuck ("Defendant") is a 52-year-old resident of Florida. In December 2020, Defendant rejoined the Proud Boys organization after a brief period away from the group. When he rejoined, Defendant became a member of the "Space Coast" chapter in central Florida, which was the home chapter of Joe Biggs, Arthur Jackman, and Defendant's son, Nathaniel Tuck.

11. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

12. Through at least January 6, 2021, Enrique Tarrio was the national chairman of the Proud Boys organization. Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location.

### *Defendant's Plans to Travel to Washington, D.C. on January 6*

13. In the period between the November 3, 2020 U.S. Presidential Election and January 6, 2021, Defendant made a number of statements in text messages reflecting his belief that the Presidential Election had been stolen as the result of fraud.

14. On November 4, 2020, Defendant expressed to a group message of family members: "I don't want you all to worry. There is a bunch of election fraud going on and we will

get to the bottom of it. In the end Donald Trump will be our president." He added, "Biden nor Harris will be President of this Country. Mark my words. The democrats have screwed themselves by trying to steal an election from the one man that would burn DC to the ground now to expose them. Lol. The left has no clue what they did or what's coming.. Lol."

    15.    On December 15, 2020, Defendant sent a text message stating "This just in: From Trump's Lawyer" to family members, and included a lengthy quotation about the details of the certification process, including in part:

> On January 6th, […] Vice President Mike Pence will have all the authority as president of the Senate for that day and will accept or reject motions to decide the next steps by the assembly.
>
> Remember... Mike Pence is in full authority that day as written in the Constitution. The ballots will be certified today but that means nothing...
>
> […]
>
> The House and Senate will divide for two hours (at least) to debate, then vote. The vote will be per Senator with the Vice President being the deciding vote if needed in the Senate, while the vote in the House will be only be ONE vote per delegation, per state, not per House member!!! The Republicans have 30 delegation votes compared to the Democrats 20 delegation votes.
>
> If this scenario runs true, President Trump gets re-elected.

From these and other communications, Defendant knew that Vice President Pence would be at the Capitol on January 6 for the certification of the Electoral College vote.

    16.    On December 16, 2020, Defendant told his son Nathaniel Tuck via text message that "War is here" and "We need to talk about a few things." Defendant listed actions to be undertaken, including procuring "Some short wave or Long wave radio that every chapter needs to have" to communicate in case of phone or internet outages; "gathering intelligence on where

these people that are causing these problems live. So we can take them out. RWDS"[1]; and procuring "More food" and "More Ammo."

17. On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, which date coincided with Congress's Certification of the Electoral College vote. That same day, Defendant and N. Tuck discussed traveling between January 5 and January 7, 2021, to attend "another million mega march in Washington D.C."

18. Tarrio and a handful of other members of the Proud Boys created a new chapter for the Proud Boys that would consist of members from across the country. The new chapter was referred to as the Ministry of Self Defense or MOSD ("MOSD"). Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members."

19. On December 27, 2020, Defendant was invited to join the MOSD by Joe Biggs, another member of the Proud Boys leadership.

20. In messages exchanged among members of the MOSD on Telegram, in which Defendant participated using Telegram Account ID# 954063759 and the moniker "Pit Bull", members discussed the potential for violence at the Capitol on January 6.

21. On January 3, 2021, the following exchange took place in the "Ministry of Self-Defense – MAIN":

Gabriel PB:     1776 flag flying over the White House last night.

The Vidivic:    ?

John Rackham:  Gonna be war soon ……

Gabriel PB:     Yes Sir time to stack those bodies in from of Capitol Hill

[…]

---

[1] "RWDS" is an acronym that stands for "Right Wing Death Squad."

E-Geezy
[Edward George, Jr]:



[…]

BrotherHunter
Jack Phillips:   Also this 🎵. So are the normies and "other" attendees going to push thru police lines and storm the capitol buildings? A few million vs A few hundred coptifa should be enough. I saw a few normie groups rush through police lines on the 12th.

Deplorable51:   cue the music……."let the bodies hit the floor let the bodies hit the floor 🎵"

22. Later on January 3, 2021, a different MOSD member posted a video message in which he remarked that the people effecting the stolen election had been "caught" and that by persisting, they were "gonna make the whole country stand up and fuckin' do bad things to bad people."

23. On January 4, 2021, members of the MOSD exchanged additional messages that discussed attacking the Capitol on January 6, 2021. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, one of the leaders of the MOSD wrote, "They would do nothing because they can do nothing."

24. Enrique Tarrio was arrested upon his arrival in Washington, D.C. on January 4, 2021. Tarrio was charged with the destruction of the BLM banner on December 12, 2020, and the possession of two high-capacity magazines that were found in his possession during his arrest.

Tarrio was released from jail on January 5, 2021. As part of the conditions of his release, Tarrio was ordered to stay away from Washington, D.C., which meant that Tarrio would not be present in Washington, D.C. on January 6, 2021.

25.    Messages were subsequently posted on Telegram that advised Proud Boys in Washington, D.C. to meet at the Washington Monument at 10 a.m. on January 6. Participants in the MOSD Telegram group were told that "[Ethan Nordean] is in charge, cops are the primary threat, don't get caught by them or BLM, don't get drunk until off the street." Members were told not to wear Proud Boys colors and instead to "[c]ome out [] as patriot!"

### *Defendant's Participation in the January 6, 2021 Capitol Riot*

26.    Defendant and his son, N. Tuck, traveled from central Florida to Washington, D.C. together with Proud Boys Arthur Jackman and Joe Biggs. The group stayed in a rental unit together on the evening of January 5, 2021.

27.    On the morning of January 6, 2021, the Tucks traveled to the National Mall with Jackman and Biggs and met a group of approximately one hundred Proud Boys members near the Washington Monument shortly after 10 a.m. As instructed, Defendant did not wear any Proud Boys colors. Defendant wore a black sweatshirt with the hood up, a black baseball cap worn backwards over the hood, a black jacket on top, and blue jeans. He also wore a black medical face mask at times.

28.    Shortly after 10 a.m., Proud Boys Ethan Nordean and Joseph Biggs marched the group away from the rally that was taking place near the Washington Monument. Nordean announced to the group that they were going to march to the Capitol.

29.    As the group marched toward the Capitol, Nordean and Biggs addressed the men, including Defendant, through a megaphone—telling them that in their view the police and

government had failed them. As the group walked past the west side of the Capitol at approximately 11:20 a.m.—more than an hour prior to the initial breach—Nordean announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means."

30. A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., Biggs gave the group of officers the middle finger, and the men marching with Biggs taunted them, yelling "treason," and warning the officers, "don't make us go against you."

31. The marching group, including the Tucks, continued to the east side of the Capitol.

32. Shortly before noon, Nordean and Biggs led the marching group back to the west side of the Capitol to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW, arriving at approximately 12:10 p.m. There the group stopped and waited for approximately thirty minutes. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them back towards the Capitol.



33. Nordean led the marching group to an area known as the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, which was approximately 100 feet away, was guarded by a handful of Capitol Police officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

34. Upon arriving at the Peace Circle, Biggs led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!"

35. At 12:53 p.m., approximately one minute after Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade. The crowd quickly overwhelmed the line of officers at the barricades. The crowd trampled the barricades and advanced toward the Capitol building. Defendant walked onto Capitol grounds as part of the advancing crowd. Defendant understood that he was not permitted to be on Capitol grounds.

36. At approximately 12:58 p.m., Defendant advanced into the West Plaza with N. Tuck and Jackman. By approximately 1:00 p.m., the group made their way to the front of the crowd and stood opposite a line of officers in riot gear.



37. Defendant remained on the West Plaza for approximately 45 minutes. From his position in the crowd, Defendant saw rioters assault law enforcement using chemical spray and hand-to-hand violence.

38. At approximately 1:45 p.m., a group of Proud Boys were assembled near the base of a set of concrete stairs on the West Plaza. The stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. A small group of outnumbered officers guarded the entrance to the stairs. One of the Proud Boys who had marched with the Tucks and the other Proud Boys to the Capitol initiated a push by shoving two officers and pushing them up the stairs. Almost instantaneously thereafter, the crowd overwhelmed the officers and pushed up the scaffolding.

39. Shortly thereafter, the Tucks reunited with Nordean, Biggs, and Jackman on the lawn just north of the concrete stairs and scaffolding. From that position, they watched as the

crowd eventually overwhelmed the line of officers and surged through the scaffolding and up the concrete stairs toward the Capitol building.

40. Upon seeing the crowd advance toward the building, Rae and Biggs rushed back to the concrete stairs in an attempt to advance to the Capitol. The Tucks remained on the lawn with Jackman.

41. The Tucks and Jackman began to move to the east side of the building by walking on the lawn around the north side of the Capitol building. The Tucks and Jackman reunited with Proud Boy Edward George, Jr. on the north lawn.



42. The group continued toward the east side of the Capitol where they encountered a line of officers who were attempting to stop the crowd from advancing to the building. At approximately 2:16 p.m., the group attempted to breach the line of officers. Defendant can be seen at the front of the group as officers attempted to stop the crowd from advancing.



43.     The crowd breached the police line, and Defendant advanced toward the Capitol building with George, Jackman, and N. Tuck.

44.     Jackman, George and the Tucks attempted to enter the Capitol building near the Senate Carriage Door at approximately 2:18 p.m. United States Capitol Police officers gave verbal commands and attempted to physically deter the crowd from entering the building. Defendant was near the front of the crowd and understood that officers were attempting to stop the crowd from entering the building. Nathaniel Tuck successfully entered the building; Defendant and the others were repelled.

45.     Defendant, George, and Jackman then reunited with Biggs and Rae on the east side of the Capitol. The group climbed the stairs near the Columbus Doors and joined the large crowd of rioters on the east terrace of the Capitol building. The group posed for a selfie.



46.     Officers on the east side of the building attempted to stop the crowd from breaching the building near the Columbus Doors. Shortly before 2:40 p.m., the crowd sang the National Anthem. As the anthem ended, the crowd began to violently attack the handful of officers at the Columbus Doors. The rioters eventually overwhelmed the officers at the doors.

47.     At approximately 2:40 p.m., Defendant pushed into the Capitol through the Columbus Doors as part of a stack with Jackman, Biggs, and George. Defendant understood that he was not permitted to enter the building, and Defendant understood that the Capitol building was restricted to allow Vice President Pence and the members of Congress to certify the results of the 2020 Presidential Election.



48.     Defendant climbed the stairs to the second floor of the Capitol building in stack formation with Jackman and George, as well as Biggs. As they climbed the stairs, the crowd around Defendant was chanting "treason!"



49. After reaching the second floor, Defendant walked down a corridor as the crowd around him continued to chant and bang on doors. Defendant then entered the gallery of the Senate Chamber at approximately 2:43 p.m. with Biggs, Jackman, and George. The group remained in the gallery of the Senate for approximately two minutes.

50. Defendant exited the Capitol Building with Biggs, Jackman, and George at approximately 2:53 p.m. through the Senate Carriage Door.

51. After exiting the building, Defendant reunited with other Proud Boys on the lawn of the Capitol. Defendant posed for a celebratory photograph on Capitol grounds with Biggs, Nordean, Jackman, Nathaniel Tuck, and George. In the photograph, below, Rae can be seen holding an American flag that George and Jackman had stolen from a corridor near the Senate Gallery.



52. On January 6, 2021, in a text message conversation with family members, Defendant stated, "We stormed the capital." N. Tuck added, "Fought the police." Defendant also

told his family members about the group's theft of a flag from the Senate, sharing a picture of the flag and stating, "We took the flag" and "It's our flag. The people's flag."

53. After the attack on the Capitol on January 6, 2021, the FBI began investigating and arresting participants in the Capitol riot, including Proud Boys. On January 20, 2021, Joe Biggs was arrested. Defendant and his son discussed Biggs's arrest in text messages. Defendant stated, "I hope he doesn't tell them about me." N. Tuck stated, "The article says the fbi says 'Biggs was seen entering with several other Proud boys who were in disguise' . . . You had a mask the whole time. You're fine. Only way is if Biggs' identifies you but he is not a snitch."

54. On March 19, 2021, while discussing the criminal charges that had been filed against Biggs and others, N. Tuck and Defendant again discussed the investigations by text message. N. Tuck expressed he thought FBI was "overcharging" Proud Boys. Defendant stated, in part, "We may lose this battle but we will win the war. We will be able to sue after." N. Tuck responded, in part, "Politics won't save us. Violence is the only way we will win." To which Defendant stated: "'Stand back and stand by' you will see that[.] Whether it's violence or whether it's in the court system we will win."

### *Elements of the Offenses*

55. The parties agree that Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1), requires the following elements:

   a. First, the defendant entered or remained in a restricted building or grounds without lawful authority to do so.

   b. Second, the defendant did so knowingly.

*Defendant's Acknowledgements*

56.     The defendant knowingly and voluntarily admits to all the elements as set forth above. Specifically, the defendant admits that he entered and remained in the restricted building and grounds of the United States Capitol without lawful authority to do so, and that he did so knowingly.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Jason McCullough*
JASON B.A. MCCULLOUGH
DC Bar No. 998006; NY Bar No. 4544953
ALEXIS J. LOEB
CA Bar No. 269895
MONIKA (ISIA) JASIEWICZ
DC Bar No. 1024941
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
(202) 252-7233
jason.mccullough2@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Kevin Tuck, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 7-25-24

Kevin Tuck
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 7/25/24

William Shipley
Attorney for Defendant

CamScanner