## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-378-TJK-4** |
| **KEVIN A. TUCK,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kevin A. Tuck to 10 months' imprisonment, 12 months' supervised release, restitution in the amount of $500, and the mandatory assessment of $25. The government recommends a four-month upward variance because Kevin Tuck, who was a sworn police officer at the time of January 6, 2021, planned and coordinated with others for weeks in advance to disrupt the Electoral College certification process with which he was intimately familiar—and then acted in accordance with those plans, leading his compatriots in collective pushes to breach police lines and enter the Capitol, making it to the gallery of the Senate Chamber, and forcing lawmakers into hiding. As a police officer in Florida, Kevin Tuck was entrusted with the power to enforce the criminal laws. On January 6, 2021, in Washington, D.C., instead of using his training and power to promote the public good, he intentionally obstructed the constitutionally mandated procedure for the peaceful transfer of power for the first time in American history, and a meaningful term of incarceration is necessary to address the unique set of circumstances presented here.

## I.    INTRODUCTION

As set forth in the Statement of Offense (ECF No. 214), then-police officer Kevin Tuck, along with his adult son Nathaniel Tuck, prepared for and then engaged in persistent efforts to interfere with police at the Capitol and disrupt the Electoral College certification on January 6. The Tucks prepared for and took these actions as part of a hand-selected group of Proud Boys members[1] that openly discussed its plans for violence at the Capitol and intention to confront police who might try to stand in their way. Kevin Tuck also discussed details of the Electoral College certification procedure on family text messages and advocated preparations for "war," including procuring communications equipment for his Proud Boys chapter and securing "More food" and "More Ammo."

On January 6, the Tucks and their associates followed through on their plans, and the Tucks were at the forefront of the breach of the Capitol building during several critical moments. They were among the first wave of rioters who entered Capitol grounds after the breach of Capitol grounds at 12:53 p.m. They watched rioters assaulting police officers on the West Plaza for approximately 45 minutes, and they took action when the crowd eventually overwhelmed officers to push up the scaffolding and to the Upper West Terrace. Specifically, the Tucks and their co-defendant Arthur Jackman made their way to the east side of the building. While en route, they encountered co-defendant Edward George, Jr., and the group continued toward the east side of the Capitol.

---

[1]  As discussed herein and set forth fully in the Statement of Offense (ECF No. 211), the Ministry of Self Defense ("MOSD" was a hand-selected group of "rally boys" who vowed to follow the commands of leadership.

At approximately 2:16 p.m., the group made a collective push to breach a police line attempting to stop the crowd from advancing to the building. They ultimately succeeded. They then approached the Senate Carriage Door at approximately 2:18 p.m., where the group attempted to enter through a door where police officers were attempting to remove rioters from inside the building. When only Nathaniel Tuck was successful, Kevin Tuck, George, and Jackman reunited with fellow Proud Boys Joe Biggs and Paul Rae on the east side of the building. The group joined together in a stack formation, with Kevin Tuck in the lead once more, and pushed through the crowd of rioters and officers to enter the Capitol through the Rotunda Door. Once inside, they climbed a nearby staircase and moved toward the Senate wing of the building. Kevin Tuck made it all the way to the gallery of the Senate Chamber—a place where he knew that Congress was supposed to be meeting, at that very time, to certify the results of the 2020 presidential election.

After leaving the building at approximately 2:53 p.m., Kevin Tuck posed for a celebratory photograph on Capitol grounds with his co-defendants and other Proud Boys, together with an American flag George and Jackman had stolen from a corridor near the Senate Gallery. Kevin Tuck then bragged in a text message conversation with family members that the group had "stormed the capital [sic]" and taken the flag—"It's our flag. The people's flag." In March 2021, in text messages with his son about FBI investigations into other Proud Boys, Kevin Tuck stated, "We may lose this battle but we will win the war," and "whether it's violence or whether it's in the court system we will win."

Kevin Tuck's rampage on January 6 had a purpose: He breached the Capitol grounds and building, making it all the way to the Senate Gallery, and interfered with officers' attempts to stop the crowd's advance because he intended to obstruct the Electoral College certification and

police's efforts to defend the building. And Tuck took these actions in concert with others who shared in his criminal purpose, including his son and remaining three co-defendants in this case. Together, they carried out and celebrated these actions as part of a larger group of Proud Boys who espoused the same objectives. *See United States v. Ethan Nordean, et al.*, No. 21-cr-175 (TJK) at ECF No. 855-2 (Gov't Sentencing Memorandum for Ethan Nordean) and ECF No. 855-3 (Gov't Sentencing Memorandum for Joseph Biggs); *United States v. Fonticoba*, No. 21-cr-638 (TJK) at ECF No. 57 (Gov't Sentencing Memorandum for Gilbert Fonticoba).

For the reasons outlined herein, Tuck's calculated and coordinated conduct on January 6 warrants the imposition of a meaningful upward variance from the applicable Guidelines range. Accordingly, the government recommends that the Court sentence Kevin Tuck to 10 months of incarceration for his conviction of violating 18 U.S.C. § 1752(a)(1).

## I.    FACTUAL BACKGROUND

The government refers the court to the Statement of Offense filed in this case, ECF No. 211, for a short summary on the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Kevin Tuck*

Kevin Tuck is a 52-year-old resident of Florida and former police officer. In December 2020, Kevin Tuck rejoined the Proud Boys organization after a period away from the group. When

he rejoined, Kevin Tuck became a member of the "Space Coast" chapter in central Florida, which was the home chapter of Joe Biggs, Arthur Jackman, and his son, Nathaniel Tuck.

The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

Through at least January 6, 2021, Enrique Tarrio was the national chairman of the Proud Boys organization. Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location.

### Kevin Tuck's Plans to Travel to Washington, D.C. on January 6

In the period between the November 3, 2020 U.S. Presidential Election and January 6, 2021, Kevin Tuck made a number of statements in text messages reflecting his belief that the Presidential Election had been stolen as the result of fraud. On November 4, 2020, Kevin Tuck expressed to a group message of family members: "I don't want you all to worry. There is a bunch of election fraud going on and we will get to the bottom of it. In the end Donald Trump will be our president." He added, "Biden nor Harris will be President of this Country. Mark my words. The democrats have screwed themselves by trying to steal an election from the one man that would burn DC to the ground now to expose them. Lol. The left has no clue what they did or what's coming.. Lol."

On December 15, 2020, Kevin Tuck sent a text message stating "This just in: From Trump's Lawyer" to family members, and included a lengthy quotation about the details of the certification process, including in part:

> On January 6th, […] Vice President Mike Pence will have all the authority as president of the Senate for that day and will accept or reject motions to decide the next steps by the assembly.

> Remember... Mike Pence is in full authority that day as written in the Constitution. The ballots will be certified today but that means nothing...

> […]

> The House and Senate will divide for two hours (at least) to debate, then vote. The vote will be per Senator with the Vice President being the deciding vote if needed in the Senate, while the vote in the House will be only be ONE vote per delegation, per state, not per House member!!! The Republicans have 30 delegation votes compared to the Democrats 20 delegation votes.

> If this scenario runs true, President Trump gets re-elected.

From these and other communications, Kevin Tuck knew that Vice President Pence would be at the Capitol on January 6 for the certification of the Electoral College vote.

On December 16, 2020, Kevin Tuck told his son Nathaniel Tuck via text message that "War is here" and "We need to talk about a few things." Kevin Tuck listed actions to be undertaken, including procuring "Some short wave or Long wave radio that every chapter needs to have" to communicate in case of phone or internet outages; "gathering intelligence on where these people that are causing these problems live. So we can take them out. RWDS"[2]; and procuring "More food" and "More Ammo."

---

[2] "RWDS" is an acronym that stands for "Right Wing Death Squad."

On December 19, 2020, then President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, which date coincided with Congress's Certification of the Electoral College vote. That same day, Kevin Tuck and his son Nathaniel discussed traveling between January 5 and January 7, 2021, to attend "another million mega march in Washington D.C."

Tarrio and a handful of other members of the Proud Boys created a new chapter for the Proud Boys that would consist of members from across the country. The new chapter was referred to as the Ministry of Self Defense or MOSD ("MOSD"). Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members." On December 27, 2020, Kevin Tuck was invited to join the MOSD by Joe Biggs, another member of the Proud Boys leadership.

In messages exchanged among members of the MOSD on Telegram, in which Kevin Tuck participated using Telegram Account ID# 954063759 and the moniker "Pit Bull", members discussed the potential for violence at the Capitol on January 6. On January 3, 2021, the following exchange took place in the "Ministry of Self-Defense – MAIN":

Gabriel PB:    1776 flag flying over the White House last night.

The Vidivic:   ?

John Rackham:        Gonna be war soon ……

Gabriel PB:    Yes Sir time to stack those bodies in from of Capitol Hill

[…]

E-Geezy
[Edward George, Jr]:



[…]

BrotherHunter
Jack Phillips:   Also this 🔪.   So are the normies and "other" attendees going to push thru police lines and storm the capitol buildings?   A few million vs A few hundred coptifa should be enough.   I saw a few normie groups rush through police lines on the 12th.

Deplorable51: cue the music…….."let the bodies hit the floor let the bodies hit the floor 🎵"

Later on January 3, 2021, a different MOSD member posted a video message in which he remarked that the people effecting the stolen election had been "caught" and that by persisting, they were "gonna make the whole country stand up and fuckin' do bad things to bad people."

On January 4, 2021, members of the MOSD exchanged additional messages that discussed attacking the Capitol on January 6, 2021. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, one of the leaders of the MOSD wrote, "They would do nothing because they can do nothing."

Messages were subsequently posted on Telegram that advised Proud Boys in Washington, D.C. to meet at the Washington Monument at 10 a.m. on January 6. Participants in the MOSD Telegram group were told that "[Ethan Nordean] is in charge, cops are the primary threat, don't

get caught by them or BLM, don't get drunk until off the street." Members were told not to wear Proud Boys colors and instead to "[c]ome out [] as patriot!"

### *Kevin Tuck's Participation in the January 6, 2021 Capitol Riot*

Kevin Tuck and his son, Nathaniel Tuck, traveled from central Florida to Washington, D.C. together with Proud Boys Arthur Jackman and Joe Biggs. The group stayed in a rental unit together on the evening of January 5, 2021. On the morning of January 6, 2021, the Tucks traveled to the National Mall with Jackman and Biggs and met a group of approximately one hundred Proud Boys members near the Washington Monument shortly after 10 a.m. As instructed, Kevin Tuck did not wear any Proud Boys colors. Kevin Tuck wore a black sweatshirt with the hood up, a black baseball cap worn backwards over the hood, a black jacket on top, and blue jeans. He also wore a black medical face mask at times.

Shortly after 10 a.m., Proud Boys Ethan Nordean and Joseph Biggs marched the group away from the rally that was taking place near the Washington Monument. Nordean announced to the group that they were going to march to the Capitol. As the group marched toward the Capitol, Nordean and Biggs addressed the men, including the Tucks, through a megaphone—telling them that in their view the police and government had failed them. As the group walked past the west side of the Capitol at approximately 11:20 a.m.—more than an hour before the initial breach— Nordean announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means." A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., Biggs gave the group of officers the middle

finger, and the men marching with Biggs taunted them, yelling "treason," and warning the officers, "don't make us go against you."

The marching group, including the Tucks, continued to the east side of the Capitol. Shortly before noon, Nordean and Biggs led the marching group back to the west side of the Capitol to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW, arriving at approximately 12:10 p.m. There the group stopped and waited for approximately thirty minutes. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them back towards the Capitol.



*Figure 1: The Tucks gather at the food trucks at 2nd Street and Constitution Avenue NW before proceeding onto Capitol Grounds.*

Nordean led the marching group to an area known as the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Before their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol grounds, which was approximately 100 feet away, was guarded by a handful of Capitol Police

officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."   Upon arriving at the Peace Circle, Biggs led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!"

At 12:53 p.m., approximately one minute after Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade and quickly overwhelmed the line of officers. The crowd trampled the barricades and advanced toward the Capitol building. Kevin Tuck walked onto Capitol grounds as part of the advancing crowd. He understood that he was not permitted to be on Capitol grounds.

At approximately 12:58 p.m., Kevin Tuck advanced into the West Plaza with his son and Jackman. By approximately 1:00 p.m., the group made their way to the front of the crowd and stood opposite a line of officers in riot gear.



*Figure 2: The Tucks and Jackman standing opposite police on the West Plaza.*

The Tucks remained on the West Plaza for approximately 45 minutes. From his position in the crowd, Kevin Tuck saw rioters assault police using chemical spray and hand-to-hand violence.

At approximately 1:45 p.m., a group of Proud Boys assembled near the base of a set of concrete stairs on the West Plaza. The stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. A small group of outnumbered officers guarded the entrance to the stairs. One of the Proud Boys who had marched with the Tucks and the other Proud Boys to the Capitol shoved two officers, driving them up the stairs. Almost instantaneously thereafter, the crowd overwhelmed the officers and moved up the scaffolding. Shortly thereafter, the Tucks reunited with Nordean, Biggs, and Jackman on the lawn just north of the concrete stairs and scaffolding. From that position, Kevin Tuck watched as the crowd eventually overwhelmed the line of officers and surged through the scaffolding and up the concrete stairs toward the Capitol building. Seeing the crowd advance toward the building, Paul Rae and Biggs rushed back to the concrete stairs in an attempt to advance to the Capitol. The Tucks remained on the lawn with Jackman.

The Tucks and Jackman began to move to the east side of the building by walking on the lawn around the north side of the Capitol building. The Tucks and Jackman reunited with Proud Boy Edward George, Jr. on the north lawn.



*Figure 3: The Tucks and Jackman traveling to the east side of the Capitol along the north lawn.*

12

The group continued toward the east side of the Capitol where they encountered a line of officers who were attempting to stop the crowd from advancing to the building. At approximately 2:16 p.m., the group attempted to breach the line of officers. In the image below, Kevin Tuck can be near the front of the group as officers attempted to stop the crowd from advancing. *See also* Ex. A at 00:00.



*Figure 4: Tuck at the front of the group breaching a police line on the north side of the Capitol; screenshot of Ex. A at 00:00 (i.e., first frame).*

The crowd breached the police line, and Kevin Tuck advanced toward the Capitol building with his son, George, and Jackman.

Jackman, George and the Tucks attempted to enter the Capitol building near the Senate Carriage Door at approximately 2:18 p.m. United States Capitol Police officers gave verbal commands and attempted to physically deter the crowd from entering the building. Kevin Tuck was near the front of the crowd and understood that officers were attempting to stop the crowd

from entering the building. Nathaniel Tuck successfully entered the building; Kevin Tuck and the others were repelled.

Kevin Tuck, George, and Jackman then reunited with Biggs and Rae on the east side of the Capitol. The group climbed the stairs near the Columbus Doors and joined the large crowd of rioters on the east terrace of the Capitol building. The group posed for a selfie.



*Figure 5: Tuck circled in yellow.*

Officers on the east side of the building attempted to stop the crowd from breaching the building near the Columbus Doors. Shortly before 2:40 p.m., the crowd sang the National Anthem. Ex. B at 0:00 – 0:54. As the anthem ended, the crowd began to violently attack the handful of officers at the Columbus Doors. *Id.* at 0:54 – 1:45. The rioters eventually overwhelmed the officers at the doors and the doors were forced open. *Id.* at 3:30. Kevin Tuck, Biggs, Jackman, and George formed a stack and moved through the crowd toward the doorway. Ex. C at 0:03 – 0:13. Individuals can be heard yelling, "Let 'em through" and "Make a hole." *Id.* At approximately 2:40 p.m., Kevin

14

Tuck pushed into the Capitol through the Columbus Doors as part of a stack with Jackman, Biggs, and George. A loud alarm was audible in the doorway. *See* Ex. B at 5:40 (Kevin Tuck, Biggs, and Jackman are visible at the bottom of the frame). Kevin Tuck understood that he was not permitted to enter the building, and he understood that the Capitol building was restricted to allow Vice President Pence and the members of Congress to certify the results of the 2020 Presidential Election.



*Figure 6: Kevin Tuck entering the Capitol at the head of a stack formation.*

Kevin Tuck climbed the stairs to the second floor of the Capitol building in stack formation with Jackman and George, as well as Biggs. As they climbed the stairs, the crowd around the group was chanting "treason!" *See* Ex. D.



*Figure 7: Kevin Tuck (circled in yellow) advancing up the stairs at the head of a stack formation.*

After reaching the second floor, Kevin Tuck walked down a corridor as the crowd around him continued to chant and bang on doors. Kevin Tuck then entered the gallery of the Senate Chamber at approximately 2:43 p.m. with Biggs, Jackman, and George. *See* Ex. E (Jackman, Biggs, and George are visible at 0:30). The group remained in the gallery of the Senate for approximately two minutes. Kevin Tuck exited the Capitol Building with Biggs, Jackman, and George at approximately 2:53 p.m. through the Senate Carriage Door.

After exiting the building, Kevin Tuck reunited with other Proud Boys on the lawn of the Capitol. Kevin Tuck posed for a celebratory photograph on Capitol grounds with Biggs, Nordean, Jackman, Nathaniel Tuck, and George. In the photograph, below, Rae can be seen holding an American flag that George and Jackman had stolen from a corridor near the Senate Gallery.



*Figure 8: Kevin Tuck circled in yellow.*

On January 6, 2021, in a text message conversation with family members, Kevin Tuck stated, "We stormed the capital." Nathaniel Tuck added, "Fought the police." Kevin Tuck also told his family members about the group's theft of a flag from the Senate, sharing a picture of the flag and stating, "We took the flag" and "It's our flag. The people's flag."

**Kevin Tuck's Conduct After January 6, 2021**

After the attack on the Capitol on January 6, 2021, the FBI began investigating and arresting participants in the Capitol riot, including Proud Boys. On January 20, 2021, Joe Biggs was arrested. Kevin and Nathaniel Tuck discussed Biggs's arrest in text messages. Kevin Tuck stated, "I hope he doesn't tell them about me." Nathaniel stated, "The article says the fbi says 'Biggs was seen entering with several other Proud boys who were in disguise' . . . You had a mask the whole time. You're fine. Only way is if Biggs' identifies you but he is not a snitch."

17

On March 19, 2021, while discussing the criminal charges that had been filed against Biggs and others, Kevin and Nathaniel Tuck again discussed the investigations by text message. Nathaniel Tuck stated that he thought FBI was "overcharging" Proud Boys. Kevin Tuck stated, in part, "We may lose this battle but we will win the war. We will be able to sue after." Nathaniel Tuck responded, in part, "Politics won't save us. Violence is the only way we will win." To which Kevin Tuck responded: "'Stand back and stand by' you will see that[.] Whether it's violence or whether it's in the court system we will win."

## II.    THE CHARGES AND PLEA AGREEMENT

On May 29, 2024, a federal grand jury returned a Third Superseding Indictment charging Kevin Tuck with six counts: violations of 18 U.S.C. §§ 1512(c)(2) and 2; 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(B); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). ECF No. 181. On September 6, 2024, Tuck was convicted of Count Two, charging violation of 18 U.S.C. § 1752(a)(1), based on a guilty plea entered pursuant to a plea agreement. *See* ECF Nos. 213-214.

## III.    STATUTORY PENALTIES

Kevin Tuck now faces sentencing on one misdemeanor count for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to one year of imprisonment, a term of supervised release of not more than one year, a fine of $100,000, restitution, and a mandatory $25 special assessment.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Presentence Report correctly sets forth the Guidelines calculations, PSR ¶¶ 117-126:

<u>Count Two: 18 U.S.C. § 1752(a)(1)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3 | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass at Restricted Building | <u>+2</u> |
| | | |
| **Total** | | **6** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | | -2 |
| | | |
| **Total Adjusted Offense Level:** | | **4** |

*See* Plea Agreement at ¶ 4(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As the PSR correctly noted, § 4C1.1 does not apply in this case, because Tuck used "violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a)(3); *see* PSR ¶ 125.

Courts in this district have defined violence as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm," and a credible threat of violence as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, 21-cr-386-2 (TNM), ECF No. 195 at 4-6; *accord United States v. Hernandez*, 21-cr-455 (CKK), ECF No. 65 at 5. When examining whether the defendant's conduct posed a credible threat of violence, the court should consider the totality of circumstances

surrounding that conduct, "including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions." *United States v. Andrulonis*, 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12. That the government did not charge Kevin Tuck with personally attacking an officer is insufficient, standing alone, "to make him eligible for the zero criminal history score offense-level reduction." *Id*.

Taken in context, Kevin Tuck's actions on January 6 involved, at a minimum, a credible threat of violence. He was at the forefront of several breaches of police lines: He stood opposite police on the West Plaza, where he could see the crowd engaging in acts of violence against offices. He then joined in efforts to overwhelm officers through the force of the mob, as he led his co-defendants in overrunning a police line on the north side of the Capitol at 2:16 p.m. and then again led their way through the Columbus Doors and a blaring alarm at 2:40 p.m. *See* Ex. B. His conduct was no accident. His discussions in preparation for January 6 contemplated the use of violence, including through preparation of communications equipment and "more ammo" in preparation for "war." He joined an unruly mob in the Senate Gallery while senators were in hiding. And after January 6, he bragged about "storm[ing]" the Capitol on the same text thread where his son boasted that he had "[f]ought the police."

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to address the reduction in offense level. Such treatment would recognize the unique nature of the

criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, notwithstanding a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated Kevin Tuck's criminal history as category I, which is not disputed. PSR ¶ 129. Accordingly, based on the government's calculation of the total adjusted offense level, after acceptance of responsibility, at 4, Kevin Tuck's Guidelines imprisonment range is 0 to 6 months' imprisonment. The plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

### **Upward Variance**

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Tuck's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, the government respectfully requests that the Court vary upwards from the top of the Guidelines range.

Kevin Tuck was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the safety of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and resulted in more

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

than $2.9 million in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Kevin Tuck "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in Kevin Tuck's Guidelines calculation reflects these facts. Kevin Tuck would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[4] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. So a sentence within Kevin Tuck's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

---

[4] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 603 U.S. 480 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, *id.* at 509 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67.

But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. As this Court recently put it, "[W]hat a dangerous precedent the attack on January 6 set. What a Pandora's Box it opened. We still don't [know] how corrosive it will prove to be to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power." *United States v. Sparks*, 21-CR-87-TJK, Sent. Tr. at 94.

Indeed, even before the Supreme Court's decision in *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. Most recently, this Court varied upwards in the case of Tuck's co-defendant Paul Rae, stating at sentencing that his Guidelines range of 6-12 months did not account for Rae's planning and preparation with a large group, including for violence, or his intent to obstruct the Electoral College certification. *See United States v. Rae*, 21-cr-378-TJK-2 (sentencing Rae to 14 months' incarceration).

Likewise, in *United States v. Sparks*, 21-cr-87-TJK, this Court sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21 and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just police officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And "not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors

[because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

Because the seriousness of Kevin Tuck's crime is not adequately captured by the applicable Guideline, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* prompted the government to dismiss the charge under 18 U.S.C. § 1512(c)(2) in this case, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would

require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up).   Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this Court has made clear its view that January 6 was "corrosive … to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power." *Sparks* Sent. Tr. at 94. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law.

In this case, the government submits that an upward variance of 4 months is warranted to reach an appropriate sentence. Although Kevin Tuck stands convicted of only a misdemeanor offense, his planning and preparation for January 6, including for the use of violence and deliberate

disruption of the Electoral College certification, along with his efforts to work in concert with others to achieve that goal, warrant a meaningful term of incarceration. Indeed, Kevin Tuck worked in tandem with others at every steps as he breached the Capitol building and entered the gallery of the Senate Chamber.

As discussed below, this Court has sentenced defendants who acted with corrupt intent to influence an official proceeding to around 48-57 months. While Kevin Tuck was not convicted of obstructing the certification, the relevant conduct described above and in the Statement of Offense demonstrate that he carried out his criminal actions with the intent to stop Congress from certifying the Presidential Election—a necessary step in the peaceful transfer of power. And Kevin Tuck came to D.C. prepared to take action through means of force and violence. This was not a righteous act of petitioning government for redress of grievances—it was a deliberate act intended to persuade government officials through the use of violence and intimidation.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As described detail in Section II of this memorandum, the nature and circumstances of Kevin Tuck's crimes threatened to create a constitutional crisis, were rife with violence and credible threats of violence, and militate strongly in favor of a substantial sentence of incarceration. Kevin Tuck's actions were concerted and purposeful, aimed at halting the certification. Kevin Tuck understood that Congress was meeting at the Capitol on January 6 to certify the electoral vote, and he knew that Vice President Pence would be at the Capitol on January 6; indeed, he

texted his family a detailed description of the procedure by which the Electoral College vote would be certified. Nevertheless, in the lead-up to January 6, Kevin Tuck joined a group of men who were undertaking extensive efforts to amass and direct force and violence against the Capitol. On January 6, he personally joined in bringing those plans to fruition, working in concert with other Proud Boys throughout the day to achieve his objective. And Kevin Tuck contributed to the violence of the riot through coordinated efforts to breach police lines.

Kevin Tuck's statements both before and after January 6 demonstrate his intent to interfere with the Electoral College certification and his willingness to engage in violence if necessary. In December, Kevin Tuck texted his son about preparations for "war," including the need to outfit Proud Boys chapters with radio equipment in case of communications outages, and the need to procure "More food" and "More Ammo." Even after the FBI began investigating and arresting January 6 rioters, including fellow Proud Boys, Kevin Tuck spoke resolutely about "winning," including through violence: "'Stand back and stand by' you will see that[.] Whether it's violence or whether it's in the court system we will win."

The sentence imposed by this Court must reflect the seriousness of Kevin Tuck's crimes.

**B. The History and Characteristics of the Defendant**

Kevin Tuck is 55 years old and lives in Apopka, Florida with his wife and adult daughter, on the same street as his son and co-defendant, Nathaniel Tuck, and another adult daughter. Kevin Tuck is currently employed as a manager of sales with a roofing company. On January 6, 2021, and at the time of his arrest in this case, Kevin Tuck was an officer with the Windermere Police Department in Windermere, Florida ("WPD"). According to a press release from the WPD following his arrest and subsequent resignation, Tuck had been a member of the WPD since May

of 2019 and had prior law enforcement experience with the Longwood Police Department for approximately six years.[5] According to the press release, Kevin Tuck traveled to Washington, D.C. for the events of January 6 without notifying his chain of command at the WPD and he initially denied being inside the Capitol when questioned at work following the events of the day.

As of January 6, 2021, Kevin Tuck was a member of the "Space Coast" chapter of the Proud Boys organization. Communications among the group routinely celebrated the use of violence to obtain an objective. And the group's discussions preparing for January 6 reflected the same. When the time came, Kevin Tuck contributed to the violence at the Capitol both individually and by working in concert with his compatriots. In the aftermath of the day's events, he continued to celebrate the violence that occurred, posing for photographs with fellow Proud Boys proudly displaying a stolen American flag.

Although Kevin Tuck's Guidelines calculation does not reflect the application of any criminal history points, the PSR identifies items that are relevant to the Court's consideration. *See* PSR ¶¶ 130-131.

Kevin Tuck's history and characteristics weigh in favor of a meaningful term of incarceration.

---

[5] The PSR states that "[t]he timeframe for his employment is unknown as Mr. Tuck did not provide this information and could not complete the presentence interview due to his temper." PSR ¶ 151.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Kevin Tuck's conduct on January 6 was the epitome of disrespect for the law, particularly given his status at the time as a sworn police officer.

Police officers are a central part of promoting and maintaining the rule of law in this country. Kevin Tuck's crimes do significant damage to the credibility of police officers in carrying out this essential role. The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law itself. When Kevin Tuck, himself a police officer, joined a group intent on deliberately resisting the police, entered the Capitol grounds, and repeatedly joined in collective efforts to defy officers attempting to maintain order, it was abundantly clear—especially to someone with Kevin Tuck's law enforcement training and experience—that the police officers were greatly outnumbered and exposed to violence of the mob. Kevin Tuck chose to disregard their commands and engage in physical defiance of their efforts. And, in doing so, Kevin Tuck knowingly heightened the risk to the officers.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although Kevin Tuck has entered a guilty plea, he has not made meaningful statements of remorse regarding his conduct on January 6. He lied to his employer, the WPD, denying his involvement in the riot until after his arrest. He was uncooperative with the U.S. Probation Office during his pre-sentence interview, as the PSR notes he "could not complete the presentence interview due to his temper." PSR ¶ 151.

Kevin Tuck's statements in the aftermath of the riot also demonstrate a lack of remorse. He boasted to family members that he and his son had "[s]tormed the capital [sic]," and took credit in texts for his co-defendant's theft of an American flag from a Senate hallway ("We took the flag"; "It's our flag. The people's flag."). When he learned that his fellow Proud Boy Joe Biggs had been arrested on January 20, 2021, he told his son he hoped Biggs "doesn't tell them about me." Finally, when Kevin and Nathaniel Tuck discussed criminal charges filed against Proud Boys in March 2021, Kevin Tuck alluded to the possibility of further political violence, stating, "Whether it's violence or whether it's in the court system we will win." Kevin Tuck's continued embrace of force and violence as a means of obtaining a political objective underscores the need for deterrence in his case.

The need for both general and specific deterrence is also especially strong because of Kevin Tuck's decision to target the Constitutionally-mandated certification of a democratic election and his participation in a criminal collective. *See Callanan v. United States*, 364 U.S. 587, 593 (1961) (noting that a "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality").

All of these factors weigh heavily in favor of an upward variance from the Guidelines advisory range.

### E.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court has sentenced others who had engaged in criminal conduct with Kevin Tuck during the events of January 6, and their sentences are instructive in this case.

Most recently, this Court varied upwards to sentence Kevin Tuck's co-defendant Paul Rae to 14 months' incarceration, from an advisory Guidelines range of 6-12 months. *United States v. Rae*, 21-cr-378-TJK-2. Rae was convicted on one misdemeanor count, in violation of 18 U.S.C. § 1752(a)(1), and one felony count of civil disorder in violation of 18 U.S.C. § 231. The Court noted at sentencing that Rae's "planning and coordination" with a large group in advance of and during January 6 set him apart from other rioters who showed up solely with the intent to protest

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

and ended up getting "caught in the moment." The Court also pointed to a comment Rae had made on January 6—"All I want to do is be violent and have Trump as my president"—as linking his violent conduct with the Electoral College proceeding occurring inside the Capitol that day.

Like Rae, Tuck planned for and coordinated with other Proud Boys, including his son, in advance of January 6 and throughout the day. He also exhibited a specific intent to interfere with the Electoral College certification. He was well familiar with the details of the certification procedure, as his text messages to family in December 2020 demonstrate, and he spoke in the lead-up to January 6 of preparations for "war."

Favorably distinguishable from Kevin Tuck, Rae toppled an in-ground metal fence behind which police had formed a line, which is why Rae was convicted of a felony and faced a felony sentence. However, Kevin Tuck did repeated harness the force of his codefendants and the mob to advance on and ultimately gain access to the Capitol building. This factor weighs tilts the balance toward a sentence resembling Rae's. And Tuck was a police officer at the time of January 6, 2021, which is a significant aggravating factor that was not present in Rae's case. In Tuck's case, the government's recommendation of 10 months incarceration to account for the totality of Tuck's conduct and circumstances is appropriate and would not create an unwarranted sentencing disparity with Rae.

This case warrants a higher sentence than the one this Court imposed in *United States v. Healion*, No. 23-cr-230 (TJK): 100 days' incarceration. Healion was a member of the MOSD group chats who interfered with police on January 6 by pulling a bike rack from officers. His own messages prior to January 6, however, did not reflect the same kind of planning or purposeful intent as in Kevin Tuck's case. Kevin Tuck messaged with his son in December 2020 about the

need for Proud Boys chapters to procure radio communications equipment and supplies, the day

after he sent a message detailing the certification procedure to be followed on January 6. Unlike

Kevin Tuck, Healion was not a sworn police officer on January 6, 2021.

Most significantly, however, Kevin Tuck's conduct warrants a higher sentence than

Healion's because Tuck acted with the deliberate purpose of disrupting to the Electoral College

certification and police's efforts to defend it, including by embracing violence as a means to

achieve a political objective. Kevin Tuck joined with his codefendants to use violence,

intimidation, and credible threats of violence on January 6, as discussed above. Indeed, Kevin

Tuck's efforts to force his way through the Columbus Doors in a stack formation with his

codefendants fundamentally places Kevin Tuck's conduct in a more serious category than that of

Healion. And once inside, Kevin Tuck traveled to the Senate Chamber—where Members of

Congress were supposed to be engaging in the very certification that Kevin Tuck aimed to stop.

After January 6, Kevin Tuck continued to advocate for violence as an acceptable means to achieve

political ends, telling his son in March 2021, "Whether it's violence or whether it's in the court

system we will win."

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss

---

[8]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Tuck must pay $500 in restitution, which reflects in part the

role Tuck played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects,

the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a

figure based on loss estimates supplied by the Architect of the Capitol and other governmental

agencies as of July 2023. *Id.* Tuck's restitution payment must be made to the Clerk of the Court,

who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR

¶ 187.

### VII.    FINE

The defendant's conviction for violations of 18 U.S.C. § 1752(a)(1) subjects him to a

statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose

---

18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $500 to $9,500. U.S.S.G. § 5E1.2(c)(3).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 10 months' imprisonment, 12 months' supervised release, $500 in restitution, and the $25 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Jason McCullough*
JASON B.A. MCCULLOUGH
DC Bar No. 998006; NY Bar No. 4544953
MONIKA (ISIA) JASIEWICZ
D.C. Bar No. 1024941
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530

37

(202) 858-7233
isia.jasiewicz@usdoj.gov